Filed 12/28/20  P. v. Quiles CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045800 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1501990) |
| v. | |
| BRENDON RENE QUILES, | |
| Defendant and Appellant. | |

Defendant Brendon Rene Quiles was convicted by a jury of murder (Pen. Code, § 187)[1] and misdemeanor resisting a peace officer (§ 148, subd. (a)(1)).  The jury also found true the special circumstance allegation that the murder occurred during the course of a robbery (§ 190.2, subd. (a)(17)).  On appeal, Quiles argues that the trial court made erroneous evidentiary rulings, the prosecutor committed misconduct in his argument, the trial court should have granted his motion for a new trial on the ground of judicial misconduct, the jury was improperly instructed on the elements of the robbery-murder special circumstance, and the robbery-murder special circumstance is unconstitutional due to the enactment of Senate Bill No. 1437.  For the reasons set forth below, we affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

BACKGROUND

1. *The Information*

On August 4, 2016, Quiles was charged by information with a count of murder (§ 187, count 1).[2]  It was further alleged that Quiles personally used a firearm during the commission of the offense (§ 12022.53, subd. (d)) and he committed the murder during the course of a robbery (§ 190.2, subd. (a)(17)).  Quiles was also charged with a misdemeanor for resisting, delaying, or obstructing a peace officer (§ 148, subd. (a)(1)).

2. *The Trial Evidence*

a.  **The Robbery and Murder**

On January 9, 2015, Christopher Azure and Quiles participated in a robbery that led to the murder of Sean Wofford.  At the time, Azure worked as a dishwasher and sold drugs, including marijuana, ecstasy, and MDMA.  He also personally used marijuana and other recreational drugs.  According to Azure, he and Quiles came up with a plan to "call somebody up [to buy marijuana] and rip him off."  Azure's role in the robbery was to make sure that the intended victim brought the requested drugs.  On the day of the robbery, Azure sent an instant message on his computer to his girlfriend that said, "Baby, we're going to be eating big soon."

Azure arranged for a drug dealer to come by.  He asked his older brother for the phone number for a person named "Little C."  Azure called Little C. and asked him how much it cost for half a pound or a pound of marijuana.  Little C. told Azure that half a pound of marijuana was $600, and Azure asked to buy half a pound.  Little C. told Azure that he would have a friend drop off the marijuana.  Little C. did not tell Azure the name of the friend who was going to bring the drugs.  Azure arranged for the drugs to be delivered to the apartment complex across the street from where he lived in San Jose.

---

[2] Christopher Azure was initially charged as a codefendant in the same information.

2

After Azure called Little C., Quiles told Azure that he needed to make a call because he wanted to get a gun for the robbery. Quiles, who was at Azure's house, stepped outside of Azure's room to make the call. After Quiles made the call, he came back inside Azure's room. The two played video games while waiting for the marijuana to be delivered. At some point, Quiles left Azure's room to retrieve the gun.[3]

The person who was going to deliver the marijuana, later identified as Wofford, called Azure and told him that he would soon be arriving at the apartment complex across the street. Wofford called Azure again when he arrived. By that time, Quiles had returned from getting the gun. Azure went outside and got into Wofford's car, which was parked at the apartment complex. Azure saw that Wofford had the drugs in a Ziploc bag in his car's "middle console." Shortly after Azure examined the marijuana, Quiles approached Wofford's car on the driver's side, where Wofford was seated. Quiles opened Wofford's door and started yelling while holding a gun in the air. At that point, Azure got out of the car and went back inside his house because he was afraid.

b. **Aftermath of the Robbery**

i. *Azure's Recollection*

Azure went inside his house and sent an instant message on his computer to his girlfriend, telling her that something bad had happened. At approximately 9:31 p.m., she responded with the message, "What happened." Azure replied at 9:33 p.m. with, "Hot shit." At 9:36 p.m., Azure sent another instant message to his girlfriend that said, "Just jacked someone." Azure's girlfriend asked, "What did you jack?" Azure responded, "I'll tell you later."

After the robbery, Quiles called Azure at 9:29 p.m. and 9:34 p.m. Quiles asked Azure if he was okay and if everything was "good" with him. An hour later, Azure saw

---

[3] On cross-examination, Azure said that Quiles told him that he was going to get "something" but did not specifically say that he was going to go get a gun.

3

Quiles at the end of his driveway. Quiles had called Azure and had told him that he was going to come back to Azure's house. Quiles told Azure that he had shot Wofford. Quiles asked Azure if he could come inside, and Azure said no because he was scared. Quiles showed Azure a black handgun that he had at his waist. Quiles then told Azure to stay quiet or else he would come back for Azure and Azure's brother. From his driveway, Azure could see that Wofford's car was still parked at the apartment complex across the street.

Azure's brother had returned to the house around the same time that the robbery occurred. Quiles told Azure that he did not have anywhere else to go, so Azure, Azure's brother, and Azure's brother's girlfriend, M.M., drove Quiles to somewhere in downtown San Jose. When Azure, his brother, and M.M. returned to Azure's house, Azure could see that Wofford's car was still parked across the street.

At approximately 4:00 a.m. that same night, Quiles called Azure and asked if he could stay over at Azure's house. Because he was tired, Azure agreed. Azure left his house several hours later at approximately 8:00 a.m. and came back around 10:30 or 11:00 a.m. By the time he returned, police officers had arrived at the scene of the crime across the street, and the street where he lived was blocked off.

Azure was afraid that he would be caught. He spoke to his brother and M.M. Azure told his brother that he had participated in the robbery the night before. His brother told him to stay in his room, but M.M. advised him to go to the police. Azure knew that Wofford had called him, and he was concerned that his phone number would show up on Wofford's call history.

Azure went outside and spoke to an officer. He lied and said that he had planned on going across the street to meet with Wofford the previous night, but somebody else ran out from the other side of the apartment complex and interfered with his plans. The officer took Azure's statement and asked if he would go to the witness center at the police department, and Azure voluntarily complied.

4

At the police department, Azure retold his lie about meeting Wofford.[4]  After officers told Azure that they did not believe his story, Azure confessed to participating in robbing Wofford.  Azure also provided officers with information about Quiles's Instagram and Facebook accounts.

Azure was not promised any deals before he spoke with the police.  However, he entered into an agreement that if did not receive a deal from the prosecution, the statements that he made during his police interviews could not be used against him during the prosecution's case in chief should criminal charges be pursued against him in the future.  Later, Azure pleaded guilty to manslaughter, marijuana, and conspiracy to sell marijuana with the understanding that he would be sentenced to 14 years in state prison.  Before entering his plea, Azure faced a maximum sentence of life in prison.

ii.      *Quiles's Call to Azure's Brother*

M.M. recalled that Quiles called Azure's brother multiple times after Wofford's murder.  M.M. told Azure's brother to pick up the phone, and someone—either M.M. or Azure's brother—recorded a conversation between Azure's brother and Quiles.  In the recorded conversation, Quiles can be heard saying, "[Azure] didn't even do nothing, niggar."

iii.      *Quiles's Movements After Leaving Azure's House and His Subsequent Arrest*

At the time of the robbery, Quiles had been dating D.V. for about three months.  A little after 11:00 p.m. on January 9, 2015, D.V. received a phone call from Quiles.  Quiles asked D.V. to pick him up.  D.V. thought that Quiles sounded like he was in a rush because he was talking quickly.  D.V. later told the police that she thought Quiles sounded scared.

---

[4] Prior to giving his statement to the police, Azure had taken ecstasy, MDMA, and marijuana, and had been "up for three days prior" to the murder.

5

When Quiles called D.V., she was out with some friends. Two hours after Quiles called her, D.V.'s friends took her back to her car, and D.V. went to get Quiles. D.V. picked Quiles up somewhere in downtown San Jose. Quiles told D.V. that he had hurt someone. Quiles and D.V. headed to a Walgreen's near D.V.'s house in south San Jose. A surveillance video from inside the Walgreen's showed Quiles and D.V. inside the store at 1:52 a.m. Quiles told D.V. that what he had done would be on the news. D.V. then took Quiles back to her house. D.V., however, was not permitted to have anyone stay overnight, so Quiles left around 4 or 5 in the morning.

Later, D.V. read a newspaper article about someone being shot and killed in a car. D.V. confronted Quiles about what she had read, and he said that he did not mean to do it. D.V. told Quiles that he might be caught. Quiles responded that he hoped he would not be caught, and he was scared.

On January 11, 2015, officers arrested Quiles while he was sitting in a parked car with D.V. Officers surrounded Quiles's car and ordered him to come out. Quiles did not initially comply with the officers' orders during his arrest. He also asked D.V. to hide his phone in her bra. After he was arrested, officers found cash on Quiles's person, including 18 $100 bills and some $20 bills.

D.V. initially lied to police and said that she picked Quiles up at around 9:30 p.m. the night that Wofford was murdered. D.V. lied to the police because she was concerned about getting Quiles in trouble. During D.V.'s interview with officers, officers told her that Quiles said that she was a stripper. D.V. was offended by the comment and said that her feelings were hurt.

Quiles was dating another woman, J.R., at the same time he was dating D.V. On the night of Wofford's murder, Quiles called J.R. multiple times at 9:41 p.m., 9:43 p.m., and 9:45 p.m. Quiles called J.R. another time at 9:56 p.m., and the call lasted 227 seconds. At trial, J.R. testified that she could not recall what Quiles called her about. J.R. remembered that Quiles stayed with her one night in January 2015, but she was

6

unsure of the exact date. J.R. talked with Quiles multiple times on January 9, 10, and 11, but she could not remember what they talked about during those calls.

After Quiles was arrested, he asked J.R. to help him track down D.V. J.R. "hacked" Quiles's Facebook page to get access to his account because she wanted to see who he was talking to. In a recorded jail conversation, Quiles and J.R. talked about J.R. deleting something off Quiles's Facebook page. At trial, J.R. admitted that she may have deleted items off Quiles's Facebook page. Quiles also asked J.R. to set up a "three-way call" with D.V.

iv.     *Neighbors' Recollection*

On January 9, 2015, neighbor1 lived in the apartment complex across the street from Azure's house. Neighbor1 arrived at the complex's parking lot at approximately 9:15 or 9:20 that evening. When he arrived, he noticed that there was a car parked in one of his apartment's assigned parking spots. Neighbor1 parked next to the parked car. He did not recognize the car, and it did not appear to be one of his family's cars. Neighbor1 saw someone inside the car, and he made eye contact with the individual. At the time, the person was alive.

Neighbor1 did not hear any gunshots that evening. The next morning at around 7 or 7:30, neighbor1 went out to his car to drive to work. Neighbor1 saw that the same car was still parked in the spot next to his car. Neighbor1 briefly glanced at the car and drove to work.

At around 11:00 a.m., neighbor1's mother went inside neighbor1's apartment and told neighbor1's brother that she thought that someone was hurt outside. Neighbor1's brother went outside and looked inside the parked car. He thought that the person inside in the car, later identified to be Wofford, appeared dead. He called the police shortly thereafter.

7

c. **The Police Investigation**

### i. *The Crime Scene*

San Jose Police Department Sergeant Michael Trudeau responded to the call about a possible dead body in a car. When he arrived, he opened the car's driver's side door and found Wofford deceased. "Miscellaneous loose papers" were found on top of Wofford's body, strewn on his abdomen. Trudeau saw a shell casing approximately 10 feet away from the car in the parking lot. Photographs were taken of the car and of Wofford's body. A photograph of the car's glove box showed that it was empty.

After Wofford's body was taken away, officers found blood transferred onto the driver's seat and pooled dried blood. Two cell phones were found inside the car, but only one of them was active and associated with a phone number.

Wofford's body had one entrance and one exit gunshot wound. The medical examiner believed that the bullet went through Wofford left arm and exited from his right chest. The trajectory of the bullet was "left to right and downward." Given his wounds, Wofford would have died within minutes.

### ii. *Neighbor2's Security Camera Footage*

San Jose Police Department Officer Christopher Jolliff assisted the investigation and canvassed the area of the crime scene. During his canvass, he located a small security camera mounted on the front window of neighbor2's apartment. Jolliff asked neighbor2 if the camera was functional and if he could provide footage from 5:00 p.m. on January 9 to 12 p.m. on January 10. The camera used a "cloud-based" system and the footage had to be downloaded from a third-party server.

Neighbor2 installed the camera so he could see his front yard and the exterior of his front door, but the camera could also view "half of the right carport," where the murder occurred. Neighbor2 used a paid service for his security camera, and the camera's footage was saved for seven days using the company's outside server.

At Officer Jolliff's request, neighbor2 downloaded the security camera footage from the night of the murder.

San Jose Police Department Officer Jorge Santiago reviewed the video downloaded by neighbor2. When the timestamp for the security camera showed that it was 9:22:52 p.m., Santiago saw a set of headlights enter the apartment complex's parking area. When the timestamp showed it was 9:26:15 p.m., Santiago heard a car horn honk. When the timestamp showed it was 9:27:02 p.m., Santiago heard the sound of an argument. Finally, when the timestamp showed it was 9:28:11 p.m., Santiago heard the sound of a gunshot.

### iii. *The Cell Phone Data*

Officer Santiago obtained Wofford's active cell phone and downloaded his call log. The last outgoing text message from Wofford's cell phone was sent at 9:25:02 p.m. After this last outgoing message, Wofford received a number of incoming messages, and he did not respond to any of them. Wofford's call log showed that he made an outgoing call to a number associated with Azure at approximately 8:00 p.m.

Quiles's phone and Azure's phone contacted each other several times the evening of the robbery including one connection at 9:25:50 p.m. that used a cell phone tower near Azure's house. The next call Quiles made at 9:29:30 p.m. used a different cell phone tower north of Azure's house. Quiles's phone made contact again with Azure's phone at 9:31:41 p.m. and 9:34:52 p.m. that same evening. Quiles then made a call to a number associated with J.R. at 9:41 p.m. at the Highway 680 corridor, north of the crime scene. The phone number associated with Quiles made additional calls as it moved south from the Highway 680 corridor toward the west side of downtown San Jose. Quiles's phone remained in that area until around 2:30 a.m., when it moved down toward south San Jose. At around 4:50 a.m., the phone moved back to the area of the cell phone tower near Azure's house.

9

### iv. *Quiles's Interview with the Police*

Quiles was interviewed by officers after his arrest. Initially, he said that the money that he was found with when he was arrested belonged to D.V., and D.V. was a stripper and had just been paid. Quiles said that he had gone to Azure's house midday on January 9, 2015, and had left sometime after it was dark. Quiles said that D.V. picked him up, they went to the Walgreen's near D.V.'s house, then went to D.V.'s house. Quiles said that he stayed at D.V.'s house until 3 or 4:00 a.m., when his sister went to pick him up, and he stayed the rest of the night at his sister's house. Quiles did not mention going back to Azure's house. At first, Quiles denied that he owned a gun. Later, he said that he purchased a .22-caliber gun when he was 17 years old.

### 3. *The Verdict, Motion for a New Trial, and Sentencing*

After the trial, a jury found Quiles guilty of murder (§ 187) and misdemeanor resisting a peace officer (§ 148, subd. (a)(1)) and found the special circumstance that he committed the murder during the course of a robbery (§ 190.2, subd. (a)(17)) to be true. The jury, however, found the allegation that Quiles personally discharged a firearm (§ 12022.53, subd. (d)) not to be true.

On July 21, 2017, Quiles moved for a new trial. In his motion, Quiles argued that he was entitled to a new trial because of prosecutorial and judicial misconduct.

On October 13, 2017, Quiles filed a motion seeking to disqualify the trial court on the ground of judicial misconduct as described in Code of Civil Procedure section 170.1, subdivision (a)(6). The trial court struck the motion on the basis that it was untimely and failed to disclose legal grounds for disqualification.

On January 26, 2018, Quiles filed a supplemental motion for a new trial again alleging claims of prosecutorial and judicial misconduct. On March 23, 2018, the trial court denied Quiles's motion for a new trial. That same day, Quiles was sentenced to life without the possibility of parole.

DISCUSSION

1. *The Time References Predicated on Neighbor2's Security Camera Footage*

Quiles argues the trial court erred when it overruled his objection to the time references derived from neighbor2's security camera footage. Quiles insists that the linchpin for establishing when the shooting occurred was the sound of the gunshot heard on neighbor2's security camera, but the prosecutor failed to lay an adequate foundation to establish the accuracy of the security camera's timestamp.

a. **Background**

At trial, Officer Santiago testified that the fatal gunshot was fired on the evening of January 9, 2015, at 9:28:11 p.m. This time was derived from the audible sound of a gunshot heard on the security camera footage provided by neighbor2.

Defense counsel objected to Officer Santiago's testimony and conducted voir dire to determine the accuracy of the security camera's timestamp. Santiago explained that the security camera footage was obtained from a server, and he had asked neighbor2 to download the footage. Neighbor2 told Santiago that he needed to download the footage from an offsite server, and the footage would be broken down into hourly segments. Santiago told neighbor2 to make a separate CD for every hourly segment "to see if [the timestamps are] accurate." Santiago did not take any other steps to verify the accuracy of the security camera's timestamp.

At the conclusion of Officer Santiago's voir dire, defense counsel again raised an objection to Santiago's testimony about when the gunshot occurred, which the trial court overruled.

b. **General Principles and Standard of Review**

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict

11

would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*), citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Lucas* (1995) 12 Cal.4th 415, 468 [applying *Watson* standard to admission of evidence with insufficient foundation].)

### c. **Admission of the Evidence Was Not Prejudicial**

Quiles argues that neighbor2's security camera footage was not properly authenticated because the only evidence before the court was that the footage was stored on a "cloud" and was downloaded in hourly segments by neighbor2 at the police's request.[5] Assuming the security camera footage was erroneously admitted, Quiles cannot demonstrate that he was prejudiced.

There was other evidence establishing when Wofford was murdered. There was Azure's testimony about the murder and the existence of messages that Azure sent to his girlfriend after the murder occurred. Azure testified that he sent a message to his girlfriend after the shooting, and Azure's girlfriend replied at 9:31 p.m. with a message, "What happened." There were also phone records showing that Quiles called Azure at approximately 9:29 p.m. and 9:34 p.m., and Azure testified that Quiles called him after he left Wofford's car. Neighbor1 testified that he saw Wofford alive in his car at approximately 9:15 p.m. or 9:20 p.m., and Wofford's phone last showed activity at around 9:25 p.m. Thus, even without the security camera footage, there was ample evidence for the jury to conclude that the shooting occurred within the time frame argued by the prosecution, which was consistent with the cell phone data that suggested Quiles was at the crime scene when Wofford was killed. Thus, the timestamp evidence, though probative, was cumulative of other evidence presented by the prosecution.

---

[5] It is unclear how downloading the footage in hourly segments ensures the accuracy of the timestamp. For example, if the timestamp is based off the time obtained from neighbor2's computer, the timestamp would be inaccurate if neighbor2's computer had the wrong time, even if the footage was downloaded in hourly increments.

12

There was also strong evidence of Quiles's guilt.  Azure testified that Quiles went to get a gun before the robbery, and Quiles later told him that he had shot Wofford.  M.M. recorded a conversation between Quiles and Azure's brother, and Quiles is heard on the recording saying that Azure, the only other participant in the robbery, did not do anything.  D.V. testified that Quiles told her that he did something that would be on the news, and when she later asked him about the newspaper article that she had read about somebody being shot and killed in a car, Quiles said that he did not mean to do it.  When D.V. told Quiles that he might be caught, Quiles answered that he hoped he would not be caught, and he was scared.

For these reasons, we conclude that even if the security camera footage was admitted in error, it is not reasonably probable that Quiles would have received a more favorable verdict had it been excluded.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

d.  **Violation of Due Process**

In his supplemental opening brief, Quiles claims that the trial court's erroneous admission of the timestamp evidence violated his right to due process and a fair trial under the federal and state Constitutions.

Typically, failure to object to the admission of evidence on constitutional grounds forfeits the argument on appeal.  (See *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [failure to object to admission of evidence as violative of Fifth, Eighth, and Fourteenth Amendment forfeits issue on appeal].)  There are certain limited exceptions to this general rule.  For example, in *Partida*, *supra*, 37 Cal.4th 428, the California Supreme Court held that a defendant may raise for the first time on appeal an argument that the admission of evidence in violation of state law rendered the trial fundamentally unfair in violation of due process.  (*Id*. at p. 435.)

Here, Quiles did not object below to the admission of evidence on the constitutional grounds that he now raises.  However, like in *Partida*, his failure to raise his objection below does not forfeit the argument on appeal.  Quiles essentially claims

13

that the admission of the evidence was a violation of state law that had the *additional* consequence of violating his due process rights. (*Partida*, *supra*, 37 Cal.4th at p. 435.) Nonetheless, "admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) This is a high standard, and " '[o]nly if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

As indicated, the security camera footage was largely duplicative of other evidence that was admitted into the record. As a result, we do not believe that its admission, even if considered erroneous, was so prejudicial that it rendered Quiles's trial fundamentally unfair.

### 2. *Exclusion of Azure's Sales of Cocaine*

Next, Quiles argues that the trial court erred when it excluded evidence that Azure sold cocaine in the past. Quiles argues the evidence should have been admitted because it directly contradicted Azure's trial testimony and impinged on his credibility.

### a. **Background**

During trial, Azure testified that he sold marijuana, ecstasy, and MDMA. When asked, Azure denied that he sold cocaine. During cross-examination, defense counsel sought to question Azure about his cocaine sales based on posts that he made on his Facebook page. The prosecutor objected to the questions on the ground of relevancy, which the trial court sustained.

Later, defense counsel explained that she wanted to introduce the Facebook posts to show that Azure had not been truthful when he testified at trial and to demonstrate that he needed money on the day of the murder. The prosecutor argued that he believed that the evidence had no "logical connection" to Azure's motive. Furthermore, the prosecutor

14

argued that he believed the evidence should be excluded under Evidence Code section 352 because it would consume undue time and would only be marginally probative to the issue of Azure's credibility.

The trial court agreed with the prosecutor that the evidence was irrelevant. The trial court stated, "[a]nd even if there was some margin of argument about motive to get money, which I also don't see the logical connection, I would exclude it under 352 primarily because I think what's relevant in this case is . . . marijuana, not . . . cocaine." Defense counsel reiterated that she believed that the evidence could be used to impeach Azure. In response, the trial court said that he believed the evidence would be "collateral" to this case.

### b. **General Principles and Standard of Review**

Evidence is admissible under Evidence Code section 352 if its probative value is not "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The "undue prejudice" referred to in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. (*Goldsmith*, *supra*, 59 Cal.4th at p. 266.) The erroneous admission or exclusion of evidence is subject to the *Watson* test—whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. (See *Partida*, *supra*, 37 Cal.4th at p. 439.)

### c. **Trial Court's Exclusion of Azure's Impeachment Evidence**

Applying these principles to Quiles's case, we conclude that the trial court did not abuse its discretion by excluding the evidence about Azure's cocaine sales.

15

Preliminarily, we agree with Quiles that evidence that Azure engaged in cocaine sales was relevant because it impeached Azure's credibility. At trial, Azure specifically testified that he did not sell cocaine. Thus, evidence that he sold cocaine would demonstrate that he lied during his testimony. Moreover, the sales of cocaine were marginally probative of Azure's motive to commit robbery because it tended to show that he needed money to erase some of his debts.

The trial court, however, reasonably concluded that the evidence was more prejudicial than probative because it would have consumed an undue amount of time and was largely cumulative of other evidence that impinged Azure's credibility. Azure already testified that he sold drugs, including marijuana, MDMA, and ecstasy. Azure also testified that he personally used drugs. Azure further admitted that he initially lied to officers about what happened after the murder, and he wanted to escape liability for what happened. On cross-examination, Azure testified about his marijuana sales and his need for money to facilitate some of his sales. He also received a plea deal in exchange for his testimony. Accordingly, the trial court did not abuse its discretion when it excluded the evidence.[6]

3. *Prosecutorial Misconduct*

Quiles argues that reversal is required because the prosecutor committed prejudicial misconduct during argument to the jury.

a. **General Principles and Standard of Review**

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial

---

[6] Since we conclude that the evidence was not erroneously excluded, we do not need to consider Quiles's claim that excluding the evidence also violated his due process rights under the Fourteenth Amendment.

with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

It is well-settled that there must be a timely and specific objection at trial and a request that the jury be admonished to preserve a claim of prosecutorial misconduct for appeal. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) "A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

b. **Prosecutor's Assertion that Defense Counsel Committed Misconduct**

i. *Background*

Defense counsel sought to introduce expert testimony on how the audio from neighbor2's security camera footage was enhanced. She also sought to introduce a transcript based on the enhanced audio. The prosecutor argued that the transcript was not the proper subject of an expert opinion. The trial court agreed, stating that it did not believe that "it's a subject of expert opinion [for the defense expert] to give an opinion to the jury as to what the video says or what the audio on the video says. That's for the jury to determine."

During closing argument, defense counsel played the enhanced audio from the security camera footage for the jury. While the audio played, defense counsel displayed a transcript for the jury to view. The prosecutor objected to the transcript, and the trial court sustained the objection. The trial court then gave the following admonition: "There is no transcript of any statement made by the decedent [Wofford] in this matter, so the suggestion that there is a transcript is erroneous and it's misconduct."

17

Afterwards, defense counsel argued that Wofford could be heard on the security camera footage saying, "Fuck it." The prosecutor objected, arguing that there was no evidence of what Wofford's voice sounded like. The trial court sustained the objection, stating, "[t]here's no evidence of whose voice is heard on that video."

During rebuttal, the prosecutor argued, "One of the worst things [defense] counsel did in that, she's never heard Sean Wofford's voice. Nobody has, not in this case. Nobody. She stood up there and testified to you she knows Sean Wofford's voice and what he said. Not only that, there's no evidence of that whatsoever. It's misconduct for counsel to do that." Defense counsel made a generic objection to the prosecutor's statement, which the trial court overruled.

The prosecutor then continued, "[Defense counsel] has not a clue what Sean Wofford was like, what his life was like, and she stands up and tells you not only that's his voice on there but she tells you she can hear things about a cellphone? Are you kidding me? I mean, they got their speakers, they got a guy who did what he could with that thing, stuck those speakers up there. Could you hear a thing? [¶] You know why we don't have a transcript for that and we have transcripts for other things? Other things are audible. We can reasonably give you something that we think is a reflection of what's said there. Maybe you can pick out one or two words, the MF word. Okay? You can't pick out anything else on that, and that's why you don't have a transcript." Defense counsel objected to the prosecutor's statements on the basis that he misstated the evidence, and the trial court overruled the objection.

The prosecutor then argued, "Counsel knows full well why we don't have a transcript for that, and she also understands why there should be no reference trying to identify a person who said something. She knows that." Defense counsel objected again, arguing that the prosecutor's statement constituted misconduct. The trial court overruled the objection.

18

ii. *Analysis*

Quiles argues that the prosecutor committed misconduct when he said that defense counsel committed misconduct by describing what she heard on the audio from the security camera footage. Quiles insists that defense counsel's argument that the voice heard on the audio was Wofford's was a reasonable inference based on the other evidence presented in the case. Furthermore, he claims that even if defense counsel had committed misconduct when making her argument, the prosecutor's argument itself was misconduct because the issue of defense counsel's misconduct was something that should have been brought to the trial court's attention and not to the jury's.

We agree that even assuming defense counsel's argument about Wofford's voice was improper, the prosecutor was not permitted to disparage defense counsel in front of the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193 [misconduct to accuse counsel of lying to jury].) The prosecutor, however, was permitted to give his opinion on the evidence, vigorously attack the defense's case, and focus on deficiencies in defense counsel's tactics. (*People v. Redd* (2010) 48 Cal.4th 691, 735 (*Redd*).) For example, it would not be misconduct for the prosecutor to assert that statements made by defense counsel concerning the factual events that occurred were speculative and that defense counsel's speculation was intended to aid Quiles. (*Id.* at pp. 734-735.)

In Quiles's case, the prosecutor's statements were forceful, but they did not constitute misconduct under these standards. The prosecutor's argument properly focused on the deficiencies in defense counsel's factual account and her tactics. (*Redd*, *supra*, 48 Cal.4th at pp. 734-735.) The prosecutor did not personally demean defense counsel or disparage her in front of jurors. He merely reiterated that defense counsel had no evidentiary basis for her claim that Wofford's voice could be heard on the audio recording.

Moreover, even if the remarks can be construed as disparaging to defense counsel, we find them harmless. The jury was instructed by the court not to let bias, empathy,

19

prejudice, or public opinion influence its decision. The jury was also instructed that nothing said by the attorneys is considered evidence. Given these instructions, the prosecutor's brief remark "resulted in 'no miscarriage of justice within the meaning of the Constitution.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 499.)

      c. **Argument Over the "660" Phone Number**

            i. *Background*

At trial, Azure testified that he told officers that he ordered marijuana the night before from "a connect from a friend." During cross-examination, defense counsel asked Azure if "the connect's number start[ed] with 660," and Azure answered yes. Azure also confirmed that he told officers that this "connect from a friend" was going to call him when he arrived. Defense counsel then asked Azure if he told officers that Wofford was going to call him when he arrived, and if Wofford called him "from the 660 number." Azure answered yes.

Later, Officer Santiago testified that two cell phones that were connected to Wofford were recovered from the crime scene. One of the cell phones started with the number "500," and the other cell phone did not have a number attached to it. Officers did not find a cell phone that was associated with a "660" number.

During her closing argument, defense counsel summarized some of the phone calls made between Quiles, Azure, and Wofford. Defense counsel referenced Azure's phone records, including calls that Wofford made to Azure from the number beginning with "500." Defense counsel then argued that Azure was also in contact with a number starting with "660" that was "associated with Mr. Wofford." The prosecutor objected to this argument on the ground that defense counsel misstated the evidence, which the trial court sustained. Defense counsel informed the court that Azure had previously testified "that was Mr. Wofford's number," and offered to show the trial court Azure's testimony. The trial court declined defense counsel's offer and told her to "go on" with her argument. Defense counsel continued with her argument, commenting to the jury that it

20

could "ask for [a] read back [on] whether or not that [('660')] number is associated with Mr. Wofford."

Defense counsel then argued that "there's a phone missing" that was associated with Wofford. Defense counsel theorized that it was likely that the shooter grabbed whatever was in Wofford's lap, which must have included drugs and a cell phone, because one of the neighbors recalled seeing Wofford look down at a cell phone while he was parked in the apartment complex parking lot. Defense counsel then argued that Azure may not have realized that he received phone calls from two phone numbers associated with Wofford, the number starting with "660" and the number starting with "500."

In his rebuttal argument, the prosecutor argued, "[Defense counsel] is playing fast and loose, too, with phones. What evidence is there that Sean Wofford had three phones?" The prosecutor then argued that the "500" phone number had been recovered from Wofford's car, and "[t]he other phone that was there, you heard the evidence, not this argument, evidence that that phone had videos, pictures on it. That's what it was used for. All right? There's only evidence of two phones." Defense counsel objected to the prosecutor's argument on the ground that it misstated the evidence, which the trial court overruled.

Later, the prosecutor made the following argument: "Counsel stated, just throwing it out there, seeing what would stick, there were several calls from Wofford. What evidence is there of that? We have his outgoing phone call log. There's one. Only one. She was wanting you to believe he has a third phone he's calling from. That phone has not been identified as belonging to him."

        ii.    *Analysis*

Quiles argues that the prosecutor committed misconduct when he accused defense counsel of being deceptive when she argued that the "660" number was attributed to Wofford.

First, the prosecutor did not misstate the evidence to the extent that it can be construed that he argued that the "660" number did not *belong* to Wofford. Azure testified that Wofford called him from the "660" number, but there was no evidence that the phone number was identified as owned by Wofford or registered to him in some way.

Second, even if the prosecutor erroneously asserted that the "660" number was not associated with Wofford, the error was harmless and it is not reasonably probable that Quiles would have received a more favorable verdict absent the mischaracterization. Any possible prejudice was ameliorated by the trial court's instruction that the attorneys' arguments were not evidence, and by defense counsel's argument in rebuttal, which advised the jury that it could ask for a read back as to whether the "660" number was associated with Wofford. Moreover, the evidence against Quiles was strong—as we have described, Azure testified that Quiles said that he shot Wofford, D.V. testified that Quiles told her that he did not mean to do it when she asked him about the shooting, and Quiles was recorded saying that Azure, the only other person involved in the robbery, did not do anything. No prejudicial prosecutorial misconduct occurred.

d. **Assertion that Defense Counsel Objected to Evidence to Prevent Jury From Seeing It**

i. *Background*

During trial, the prosecutor introduced evidence of a report prepared by the Bureau of Alcohol, Tobacco, and Firearms (ATF) for a gun that was seen in a photograph on D.V.'s phone. Defense counsel objected to the report on the grounds that it was hearsay and lacked foundation, which the trial court overruled. The report indicated that the gun was initially sold by the manufacturer to the New Hampshire State Police in August 2007.

During his closing argument, the prosecutor commented, "Exhibit 22 [(the ATF report)]. This was an exhibit counsel objected to. She didn't want it into evidence."

22

Defense counsel objected to this statement on the ground of prosecutorial misconduct, which the trial court overruled.

ii. *Analysis*

Quiles argues the prosecutor committed misconduct when he asserted that defense counsel did not want the jury to see the ATF report. Quiles insists that defense counsel's evidentiary objections should not be weighed against him.

Even if we construed the prosecutor's comment to be misconduct, it did not amount to reversible error. The comment by the prosecutor was relatively brief in the face of strong evidence of Quiles's guilt, and the trial court had already admonished the jury that nothing that the attorneys said was considered evidence. Additionally, the ATF report was not particularly probative of Quiles's guilt, so the prosecutor's assertion that defense counsel did not want the jury to see the report had little prejudicial effect. Given the context of the statements, we do not believe it is reasonably probable that Quiles would have received a more favorable verdict in the absence of error. (*People v. Stewart*, *supra*, 33 Cal.4th at p. 499.)

e. **Reference to Witness's Immunity Agreement**

i. *Background*

M.M. testified under an immunity agreement. The prosecutor's petition requesting the immunity agreement did not expressly state the reason why immunity was sought, only that M.M. had exculpatory evidence about Azure that corroborated Azure's statement to the police. Before M.M. testified, the prosecutor explained outside the presence of the jury that he sought the immunity agreement because "there's potentiality for Fifth Amendment rights at issue here to the extent [M.M.'s] asked about her recollection whether she recorded [the conversation] or not." Thereafter, the trial court signed the immunity agreement.

During closing argument, the prosecutor argued that M.M. had an immunity agreement with the prosecution because she recorded the conversation between Quiles

23

and Azure's brother. The prosecutor stated, "[Defense c]ounsel says you don't know who recorded [the conversation] and when it happened. Yes, you do. There's only two people who could have recorded that. And she was asked this over and over again, and she stuck to her guns. I was there and [Azure's brother] was there. She didn't remember anybody else. She wasn't going to say or didn't say I recorded it. That's why she has immunity, not because there's some nefarious, sinister thing she's done in this case."

Defense counsel objected to the argument as misconduct, arguing that the prosecutor was not permitted to say "why a witness has immunity." The trial court overruled the objection. The prosecutor then said, "The petition was submitted to this Court explaining why immunity was required. Counsel has a copy of it. [¶] It's illegal to record a conversation with certain exceptions. That's why she has immunity. Okay? That's why she was granted it. There's no evidence in this case that she was plotting the murder of this drug dealer."

ii.     *Analysis*

Quiles argues that the prosecutor's argument constituted misconduct because there was no evidence before the jury about why M.M. testified under an immunity agreement, and we agree. In general, counsel cannot misstate or mischaracterize the evidence or give their personal opinion, nor can they imply the existence of evidence that is not in the record. (*People v. Avena* (1996) 13 Cal.4th 394, 420-421; *People v. Lucas*, *supra*, 12 Cal.4th at pp. 472-473; *People v. Kirkes* (1952) 39 Cal.2d 719, 724.) During trial, the prosecutor explained to the trial court why he sought an immunity agreement for M.M. *outside* the jury's presence.

Assuming the prosecutor's comment constituted misconduct, we find no prejudice. The references to M.M.'s immunity agreement were only marginally probative and were collateral to the main issues raised at trial. The prosecutor intended to argue that M.M. had no ulterior motive for making the recording between Quiles and Azure's brother. In fact, there was little evidence to suggest that M.M. had such an ulterior motive.

24

Moreover, as we have described, the jury was already advised that the attorneys' arguments were not evidence, and there was strong evidence of Quiles's guilt. Accordingly, any error was harmless.

f. **Cumulative Impact of the Misconduct and Violation of Due Process**

Finally, Quiles argues that the cumulative instances of prosecutorial misconduct warrant reversal of his convictions. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) "A claim of cumulative error is in essence a due process claim and is often presented as such [citation]. 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

We have either found that no misconduct occurred or that each individual case of misconduct was not prejudicial. We conclude that even if we cumulate the prejudicial impacts of any alleged misconduct, reversal is not required. Quiles " 'has merely shown that his " 'trial was not perfect—few are.' " ' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.) For these same reasons, we also find no merit in Quiles's claim, raised in his supplemental opening brief, that the prosecutorial misconduct violated his due process rights under the Fourteenth Amendment.

4. *Judicial Misconduct*

After the jury returned its verdict, Quiles moved for a new trial on the ground of judicial bias. The trial court judge refused to permit defense counsel to present live testimony and denied the motion based on the declarations attached to defense counsel's new trial motion.

a. **General Principles and Standard of Review**

"We review claims of judicial misconduct on the basis of the entire record." (*People v. Peoples* (2016) 62 Cal.4th 718, 789.) "A trial court should . . . refrain from making comments before the jury that might suggest it has allied itself with the

25

prosecution. [Citation.] For example, '[a] trial court commits misconduct if it "persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . . ." ' " (*Seumanu*, *supra*, 61 Cal.4th at p. 1320.) A trial court " 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.)

" ' " '[O]ur role . . . is not to determine whether the trial [court's] conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the [court's] behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " ' " (*Seumanu*, *supra*, 61 Cal.4th at p. 1321.) Generally, "a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*Id.* at p. 1320.) However, "a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct." (*People v. Perkins* (2003) 109 Cal.App.4th 1562, 1567.)

A new trial motion is typically governed by section 1181, which delineates nine grounds for a new trial. Section 1181 states that a new trial motion may be granted *only* on the grounds stated in that section, and judicial misconduct is not one of the listed grounds. Nonetheless, "new trials are frequently granted on nonstatutory grounds where the failure to do so would result in a denial of a fair trial to a defendant in a criminal case. . . . [¶] . . . [¶] The power to grant a new trial on such nonstatutory grounds obviously is derived from the trial court's constitutional duty to insure an accused a fair trial." (*People v. Davis* (1973) 31 Cal.App.3d 106, 109-110.)

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable

26

abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "Such an abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) " ' "[I]n determining whether there has been a proper exercise of discretion on such a motion, each case must be judged from its own factual background." ' " (*Delgado*, *supra*, at p. 328.) Moreover, when constitutional rights are at stake, our standard of review must comport with the "usual practice for review of mixed question determinations affecting constitutional rights." (*People v. Cromer* (2001) 24 Cal.4th 889, 901.) When reviewing a mixed question, we defer to the trial court's findings of fact and apply an independent review on questions of law and on mixed fact-law questions. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 182.)

b. **Background**

i. *The New Trial Motion*

On July 21, 2017, defense counsel filed a motion for a new trial alleging claims of prosecutorial and judicial misconduct. In support of the motion, defense counsel submitted a declaration that she prepared. Defense counsel declared that the trial court judge's "manner of speech," "physical demeanor," and "rulings" demonstrated a bias against the defense. The declaration also outlined several instances where defense counsel believed the judge engaged in misconduct.

First, defense counsel alleged that the trial court judge became hostile toward her after she requested that her client be present at all proceedings. According to defense counsel, the judge rolled his eyes, scowled, and crossed his arms when defense counsel addressed the court. Defense counsel characterized the judge's vocal inflections as abrasive and his responses to defense counsel as abrupt. The judge "ignored [defense counsel], would not look at [defense counsel] when [she] spoke, and consistently sided with the prosecution. The [judge] consistently denied [defense counsel's] requests to approach the bench for discussions but granted the same requests by the prosecutor."

Second, defense counsel claimed that the trial court judge consistently interrupted her during voir dire "in an aggressive manner, belittled [her] in front of jurors, and interrupted [her] Opening Statements."

Third, the trial court judge attempted to have an off-the-record discussion with defense counsel about a juror despite counsel's earlier request that her client be present for all proceedings. When defense counsel informed the judge that she was not going to agree to participate in the off-the-record discussion, he "yell[ed] for [defense counsel] to return" to chambers in front of the juror in question.

Next, defense counsel claimed that the prosecutor violated the trial court judge's rulings on his motions in limine multiple times during his opening statement by including an unredacted photograph in his PowerPoint presentation. Defense counsel objected to the photograph and brought the violation to the judge's attention. The prosecutor explained that he had forgotten to take out the photograph, but the judge did not reprimand the prosecutor or give the jury a curative instruction.

Defense counsel also cited to instances where she believed the trial court judge demonstrated bias against her during the presentation of evidence. For example, during trial, the prosecutor wanted "to present a video of cooperating witness [D.V.]" Defense counsel objected to certain portions of the transcript of the video being admitted into evidence. The judge "did not review the transcript and allowed the video [to] be shown to the jury."

In another example, defense counsel stated during her closing argument that a certain phone number was associated with Wofford during her closing argument. The prosecutor objected to defense counsel's statement, and the trial court judge sustained the objection and would not permit defense counsel to make her argument. Defense counsel informed the judge that she possessed the trial transcript that supported her claim that the phone number was associated with Wofford, but the judge indicated that he was not going to review the transcript and did not permit defense counsel to make her argument.

28

Finally, defense counsel was informed that the trial court judge and the prosecutor had an ex parte communication about why exhibits were not ready for the jury. The prosecutor represented that he had e-mailed defense counsel a list of exhibits, and she did not respond. Defense counsel was not aware if any information about the case was discussed outside her presence.

ii.     *Motion to Disqualify*

On October 13, 2017, defense counsel filed a motion seeking to disqualify the trial court judge under Code of Civil Procedure section 170.1, subdivision (a)(6) on the grounds that the judge was not impartial and had a bias or prejudice against defense counsel. On October 19, 2017, the trial court judge filed an order striking the motion finding that defense counsel's motion did not disclose legal grounds for disqualification and the motion was not timely filed.[7]

iii.     *Supplemental Statement of the Case and Fact*

On January 26, 2018, defense counsel filed a supplemental statement of the case and facts in support of her motion for a new trial.

Attached to the motion was a declaration prepared by the defense's private investigator. In his declaration, the investigator stated that he was present for the majority of Quiles's trial and observed the testimony of many witnesses, including Azure. According to the investigator, the trial court judge's "distaste" for defense counsel "was evident throughout the trial," and the judge oftentimes sustained objections with crossed arms and scowls. In contrast, the judge "spoke respectfully and behaved politely" when interacting with the prosecutor. The investigator observed that he did not see any acts taken by defense counsel that would warrant the judge's "disrespectful and demeaning behavior." The investigator further stated that "[p]art of what made this behavior so

_____

[7] Quiles sought writ review of the order striking his motion to disqualify, which this court summarily denied in H045196, *Quiles v. Superior Court*.

29

disrespectful was the blatant sexism exhibited by [the court]." The investigator, who had been licensed since 1999, asserted that he had "never seen a judge behave as disrespectfully towards an attorney as [the court] did towards [defense counsel]."

Also attached to the motion was a declaration prepared by a private attorney who was present during a portion of Quiles's trial. In his declaration, the private attorney stated that during Azure's cross-examination, the trial court judge "had his arms crossed and scowled at [defense counsel]. [The judge] rolled his eyes at [defense counsel] when she was looking away and appeared to harbor extreme dislike for her." Furthermore, when the prosecutor objected to defense counsel's attempt to lay a foundation for evidence concerning a phone number, the judge sustained the prosecutor's objections "with his arms crossed and a pronounced scowl" in defense counsel's direction. The private attorney believed that the judge's actions toward defense counsel stood in contrast to his respectful and polite attitude toward the prosecutor.

### iv. *The Hearings*

On February 22, 2018, the trial court judge held a hearing and discussed scheduling issues for the new trial motion. Defense counsel told the trial court that she wanted to present live testimony at the hearing because the People were objecting to using the declarations as evidence.[8]

On March 23, 2018, the trial court judge held a hearing on the new trial motion. Defense counsel requested a continuance, explaining that she had two witnesses that needed to give testimony on the matter.

In response, the trial court judge stated, "[w]e're not going to have an evidentiary hearing. I'm not going to call witnesses." The judge explained that he did not believe it was necessary to call witnesses because he did not think that witness testimony would

---

[8] The prosecutor's opposition to defense counsel's motion for a new trial objected to the use of declarations as hearsay.

assist in making his determination. The judge stated that the matter would be "decided on the papers and on the declarations and exhibits that [defense counsel] filed with [her] motion."

The trial court judge made his ruling after hearing argument from the parties. First, the judge found no instances of prosecutorial misconduct and no showing of prejudice to Quiles based on the prosecutor's actions.

Second, the trial court judge addressed the claims of judicial misconduct, stating: "I think that [the claims are] exaggerated. I don't think that I committed most of the things that you have indicated or any of the things that you've indicated in your brief. I was not prejudiced against you or your client. There were some discussions that took place, some heated discussions that took place between you and I during the trial. There were some things that came up that required those discussions. And just because there was a heated discussion or I ruled against you does not mean that I was prejudiced against you. And I don't think I was. And I don't think that the things that you've raised in your brief or in your declarations or in the declarations you submitted with your brief were true. And on that basis—that's one of the bases. [¶] And the other thing is that, even if I were to accept your statements as true, which I don't, I don't think it in any way affected the jury's verdict. There's certainly no prejudice to Mr. Quiles, but I'm not admitting that I did any of those things. [¶] And, finally, the assertion of judicial misconduct is not even a ground for new trial under Penal Code Section 1181. And if you read 1181, it's very specific that the grounds stated therein are the only grounds for which a new trial may be brought."

v. *Other Instances of Judicial Misconduct Not Raised in New Trial Motion*

In his opening brief, Quiles discusses several other instances of alleged judicial misconduct that were not raised in his new trial motion. Quiles alleges that on March 14, 2017, the trial court judge lost his patience with defense counsel when she began to make

certain arguments. Next, Quiles argues that the judge repeatedly inserted himself into defense counsel's examination of prospective jurors during voir dire.

Quiles also makes general observations about the trial court judge's demeanor during trial. He argues that the record reflects that the prosecutor made speaking objections without admonishment or censure from the trial court. Moreover, Quiles insists that the prosecutor was routinely permitted to approach the bench, but defense counsel was often denied that same opportunity. Quiles asserts that bias against defense counsel was further shown by the fact that the judge often accepted representations made by the prosecutor without question.

c. **Forfeiture of Claims**

Preliminarily, the People argue that Quiles's claims of judicial misconduct have been forfeited because he did not make specific and contemporaneous objections to the claimed instances of misconduct during his trial, nor did he request the jury be admonished. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1320; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1108.) Generally, "a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*Seumanu*, *supra*, at p. 1320.) Quiles belatedly raised some of his claims of judicial misconduct in his motion for a new trial after the trial had concluded and failed to raise some of his other claims until he filed his appeal. Quiles argues that the claims raised in the new trial motion are not forfeited, but we disagree. The filing of the new trial motion was not a substitute for a timely, specific objection at trial because it could not give the trial court the opportunity to correct any error and mitigate prejudice. (See *People v. Williams* (1997) 16 Cal.4th 153, 254 [new trial motion did not properly preserve claims of prosecutorial misconduct]; see also *People v. Cowan* (2010) 50 Cal.4th 401, 506 [new trial motion did not preserve claim evidentiary error].)

We acknowledge that "a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such

misconduct." (*People v. Perkins*, *supra*, 109 Cal.App.4th at p. 1567.) The declarations submitted by defense counsel in support of her new trial motion describe the trial court judge as highly antagonistic toward defense counsel. However, we have reviewed the entirety of the trial transcript, and although there are instances where the judge rebuked defense counsel and overruled defense counsel's objections, there are also multiple instances where the trial court ruled in defense counsel's favor. The record does not demonstrate that an objection to the purported misconduct would have been futile. Accordingly, Quiles's claims have not been preserved on appeal.

d. **Claims of Misconduct Were Meritless**

Moreover, even if we assume that the judicial misconduct claims were not forfeited, the misconduct does not warrant reversal of Quiles's convictions.

First, the instances where the trial court judge displayed impatience toward defense counsel are not misconduct. (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*) [judicial bias not shown where trial judge was sometimes impatient and exchanges with defense counsel were occasionally "especially contentious"].) " '[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*Ibid.*) "[M]anifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial." (*Id.* at pp. 78-79.) Bias and partiality are not demonstrated by "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as . . . judges, sometimes display." (*Liteky v. United States* (1994) 510 U.S. 540, 555-556.)

Quiles also argues that judicial bias is demonstrated by the trial court judge's preferential treatment of the prosecutor. For example, Quiles claims that the judge did not properly consider defense counsel's objections during trial. Although the judge's

33

rulings on some of defense counsel's objections were brusque, he did not disparage defense counsel during his rulings. "Moreover, a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112, overruled on other grounds as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) And even if some of the trial judge's rulings were erroneous, the erroneous rulings were not so pervasive as to render the trial fundamentally unfair. (*Snow*, *supra*, 30 Cal.4th at p. 78.)

We also find no merit in Quiles's claim that he was entitled to an evidentiary hearing on his new trial motion with the ability to call live witnesses. Quiles does not cite to any authority for the proposition that a trial court is *required* to permit witness testimony in connection with a new trial motion alleging claims of judicial misconduct.[9] In the context of a new trial motion based on juror misconduct, our Supreme Court has consistently held that an evidentiary hearing is not required, and the trial court's only obligation is to " ' " 'make whatever inquiry is reasonably necessary' " to resolve the matter.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517; *People v. Williams* (1997) 16 Cal.4th 635, 686 [trial court can hold evidentiary hearing when defendant moves for new trial based on jury misconduct, but hearing should be held only when trial court concludes an evidentiary hearing is necessary to resolve material, disputed issues of fact].) Our Supreme Court has also found that an evidentiary hearing is not required on a

---

[9] In his opening brief, Quiles argues that failure to permit live testimony had the effect of precluding "intelligent appellate review" of his claims of judicial misconduct, citing *People v. Cruz* (1978) 83 Cal.App.3d 308, 318. In *Cruz*, the appellate court determined that the trial court failed in its duty of inquiry in determining the defendant's reason for requesting substitution of an appointed attorney under *People v. Marsden* (1970) 2 Cal.3d 118. (*Cruz*, *supra*, at pp. 317-318.) Quiles's new trial motion is not a *Marsden* motion, and *Cruz* is not completely analogous to Quiles's case. Moreover, precluding live witness testimony does not prohibit this court from examining Quiles's claims. The declarations attached to the motion for new trial contain detailed descriptions of the trial court judge's alleged misconduct.

new trial motion alleging ineffective assistance of counsel. (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.)

Finally, Quiles points to the trial court judge's refusal to permit live witness testimony and argues that a reasonable person would view this decision as raising doubts as to the judge's impartiality. On the surface, the fact that the judge entertained claims pertaining to his *own* misconduct may raise a shadow of impropriety. Quiles, however, already challenged the judge's decision to strike his disqualification motion by way of a writ petition, which this court denied. And on this record, we cannot say it was unreasonable for the judge to proceed without live witness testimony. The declarations submitted by defense counsel contained detailed factual accounts of the claimed instances of misconduct, and the judge may have reasonably concluded that an evidentiary hearing was not necessary to resolve any factual disputes.

In sum, we do not believe the trial court judge abused his discretion when he denied Quiles's motion for a new trial. And since we find that the judge did not abuse his discretion when he denied the motion, we also find no merit in Quiles's claim that the denial of the motion violated his due process rights under the Fourteenth Amendment.

5. *Cumulative Error*

Quiles argues that the cumulative effect of his claimed errors—the evidentiary errors, the prosecutorial misconduct, and the judicial misconduct—resulted in a miscarriage of justice that requires the reversal of the judgment. As we previously explained, errors that are individually harmless may have a cumulative effect that is prejudicial. (*In re Avena*, *supra*, 12 Cal.4th at p. 772, fn. 32.) To the extent that we have found errors, we have individually found them to be harmless. Moreover, we conclude that even if we cumulate the alleged errors, it is not reasonably probable that Quiles would have received a more favorable outcome in their absence. Therefore, we must reject his claim of cumulative prejudice.

35

6. *Failure to Instruct with CALCRIM No. 703*

Quiles argues that the jury's determination that he did not personally use a firearm during the commission of the offense (§ 12022.53, subd. (d)) supports a finding that he was not the actual killer. Thus, he asserts that the jury's true finding on the robbery-murder special circumstance (§ 190.2, subd. (a)(17)) must be reversed because the jury was not instructed with CALCRIM No. 703.

a. **Background**

At the close of evidence, the trial court discussed the proposed jury instructions with counsel. The trial court asked, "Also, the proposed instruction that was submitted, CalCrim 703, both parties have agreed that that instruction should not be given. Correct?" Defense counsel and the prosecutor both answered, "Correct."

Thereafter, the jury was instructed with CALCRIM No. 540A on felony murder, which states in part: "The defendant is charged in Count 1 with murder under the theory of felony murder. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that, one, the defendant committed or attempted to commit the crime of robbery; two, the defendant intended to commit the crime of robbery; and three, while committing or attempting to commit the crime of robbery, the defendant caused the death of another person. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. To decide whether the defendant committed or attempted to commit the crime of robbery, please refer to the separate instruction I will give you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder."

The jury was also instructed with CALCRIM No. 3149 on the allegation that Quiles personally used a firearm during the commission of the offense, which states in part: "If you find the defendant guilty of the crime charged in Count 1, you must then decide whether the People have proved the additional allegation that the defendant

36

personally and intentionally discharged a firearm during that crime causing death. [¶] To prove this allegation, the People must prove that, one, the defendant personally discharged a firearm during the commission or attempted commission of that crime; two, the defendant intended to discharge the firearm; and three, the defendant's act caused the death of a person."

Finally, the jury was instructed with CALCRIM No. 730 on the robbery-murder special circumstance (§ 190.2, subd. (a)(17)), which states in pertinent part: "The defendant is charged with a special circumstance of murder committed while engaged in the commission of a robbery in violation of Penal Code Section 190.2(a)(17). To prove that this special circumstance is true, the People must prove that, one, defendant committed or attempted to commit the crime of robbery; two, the defendant intended to commit the crime of robbery; and three, the defendant did an act that caused the death of another person. [¶] To decide whether the defendant committed or attempt to commit the crime of robbery, please refer to the separate instruction I've given you on that crime. You must apply those instructions when you decide whether the People have proved this special circumstance. The defendant must have intended to commit the crime of robbery before or at the time of the act causing death. [¶] In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit the crime of robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of robbery was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

b. **General Principles and Standard of Review**

Section 190.2, subdivision (a)(17) provides, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission

37

of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [¶] (A) Robbery in violation of Section 211 or 212.5."

Section 190.2, further provides: "(b) Unless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an *actual killer*, as to whom the special circumstance has been found to be true under Section 190.4, need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for life without the possibility of parole. [¶] (c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4. [¶] (d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (Italics added.)

Based on the language of section 190.2, the robbery-murder special circumstance can be found true if any of the following three theories are proven: (1) The defendant is the actual killer. If the defendant is the actual killer, the defendant need not have an intent to kill. (§ 190.2, subd. (b).) (2) The defendant is not the actual killer, but, with the intent to kill, aids or abets "any actor" in the commission of the murder. (§ 190.2, subd. (c).) (3) The defendant is not the actual killer and did not have an intent to kill but

38

aids and abets in the underlying felony, was a major participant in the underlying felony, and acted with reckless indifference to human life.  (§ 190.2, subd. (d).)

Here, the jury was instructed with CALCRIM No. 730, the robbery-murder special circumstance instruction based on the theory that the defendant was the actual killer.  The jury was not instructed with CALCRIM No. 703, the robbery-murder special circumstance instruction based on the two theories where the defendant was *not* the actual killer.

In part, CALCRIM No. 703 provides as follows:  "If you decide that [the] defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of [robbery-murder], you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life. [¶] In order to prove [this] special circumstance[] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/[or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; [¶] AND [¶] 3. When the defendant participated in the crime, [he] acted with reckless indifference to human life."

The Bench Notes to CALCRIM No. 730 indicate that the trial court has the duty to give CALCRIM No. 703 when "the evidence raises the potential for accomplice liability."  Likewise, the Bench Notes to CALCRIM No. 703 state, "[t]he court has a sua sponte duty to instruct the jury on the mental state required for accomplice liability when a special circumstance is charged and there is sufficient evidence to support the finding that the defendant was not the actual killer.  [Citation.]  If there is sufficient evidence to show that the defendant may have been an accomplice and not the actual killer, the court has a sua sponte duty to give the accomplice intent instruction, regardless of the prosecution's theory of the case."

39

c.  **The Error Was Invited**

On appeal, Quiles argues that the special circumstance finding must be reversed because the jury was not instructed with CALCRIM No. 703.  He argues that defense counsel in part argued that Azure was the actual shooter.  Thus, he insists that the trial court's sua sponte failure to instruct on the required elements for the special circumstance finding if the jury found that he was *not* the actual killer was prejudicial.

Quiles acknowledges that defense counsel expressly agreed not to have the jury be instructed with CALCRIM No. 703 but insists that the doctrine of invited error is not applicable because it "applies [only] when the defense has made a ' " ' "conscious and deliberate tactical choice" ' " ' in asking for the instruction in question." (*People v. Merriman* (2014) 60 Cal.4th 1, 104.)  Quiles relies on *People v. Souza* (2012) 54 Cal.4th 90, 114, where the Supreme Court held that the doctrine of invited error applies when defense counsel fails to request an instruction or objects to an instruction on lesser included offenses "only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*Ibid.*)

Here, defense counsel did not state her reasons for deliberately foregoing CALCRIM No. 703, but the fact that she did not state her reasons on the record does not preclude the application of the invited error doctrine.  "[T]he record must show only that counsel made a conscious, deliberate tactical choice between having the instruction and not having it." (*People v. Cooper* (1991) 53 Cal.3d 771, 831.)  "In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49; accord, *People v. Seaton* (2001) 26 Cal.4th 598, 668 [defendant invited any conceivable error in giving jury instructions because he asked the court to give them].)  The record reflects that defense counsel expressly agreed to exclude CALCRIM No. 703 and had a clearly implied tactical purpose.  As we have stated, defense counsel argued that "everything points to Mr. Azure being the shooter."

40

Based on defense counsel's theory and argument, we can surmise that defense counsel decided to forego CALCRIM No. 703 because it would have permitted the jury to find Quiles guilty of murder based on *two additional* theories where he was the nonkiller, not solely on the theory that Quiles was the *actual* killer.

Consequently, Quiles cannot now complain that the trial court erred when it failed to include this instruction.

d. **Any Error Was Harmless**

Even if we were to consider Quiles's arguments on the merits, we would reject them. Quiles likens his case to *People v. Mil* (2012) 53 Cal.4th 400 (*Mil*). In *Mil*, the jury was instructed on the elements of the felony-murder special circumstance for a defendant who was an actual killer but was *not* fully instructed on the elements of the special circumstance for a defendant who was not the actual killer. The Court of Appeal determined that the jury must have convicted the defendant as an aider and abettor and not as the actual killer in accordance with the prosecution's argument, and acknowledged that the trial court erred in failing to instruct the jury on the elements of the special circumstance for a nonkiller. (*Id*. at p. 408.) However, the Court of Appeal subsequently determined that the error was not prejudicial in light of the overwhelming evidence of the required elements—that the defendant was a major participant in the underlying felony and that he acted with reckless indifference to human life. (*Ibid*.)

*Mil*, however, is distinguishable from Quiles's case. Unlike in *Mil*, the prosecutor in this case did not argue that Quiles was guilty as an aider and abettor. (*Mil, supra,* 53 Cal.4th at p. 408.) The prosecutor expressly argued that Quiles was the one who shot Wofford.

Furthermore, the jury instructions reflect that the jury convicted Quiles based on the theory that he was the actual killer, not an aider and abettor. The jury was instructed with CALCRIM Nos. 540A and 730. CALCRIM No. 540A, the instruction on felony murder where the defendant allegedly committed the fatal act, requires the jury find that

41

Quiles "caused the death of another person." Likewise, CALCRIM No. 730 requires that Quiles "did an act that caused the death of another person." In other words, when it reached its verdict, the jury found beyond a reasonable doubt that Quiles was the actual killer who committed an act that caused Wofford's death.

Accordingly, even if we assume that the trial court erred in failing to give CALCRIM No. 703, any error was not prejudicial and was harmless beyond a reasonable doubt. " 'We have consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.' " (*Mil*, *supra*, 53 Cal.4th at p. 409.) Any failure to instruct on the elements of being a major participant and acting with reckless indifference was harmless because those elements are required only when a jury finds that a defendant was *not* the actual killer.

Quiles disagrees and argues that the jury necessarily found that he was not the actual killer because it did not find the firearm enhancement under section 12022.53, subdivision (d) to be true. To find the section 12022.53, subdivision (d) enhancement to be true, the jury must find that the defendant personally and intentionally discharged a firearm during the commission or attempted commission of the crime, and the defendant's act caused the victim's death.

Quiles, however, fails to acknowledge that "when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance." (*People v. Jackson* (2016) 1 Cal.5th 269, 347.) In fact, CALCRIM No. 540A specifically instructed the jury that a person can be guilty of felony murder "even if the killing was unintentional, accidental, or negligent." There is nothing incompatible with the jury's determination that the People proved beyond a reasonable doubt that Quiles fired the fatal shot—and was the actual killer—but failed to meet its burden of proof to show that Quiles *intentionally* discharged

42

the firearm as required under section 12022.53, subdivision (d).  Accordingly, even if there was instructional error, it was harmless under any standard.

7.  *Constitutionality of the Special Circumstance*

Lastly, Quiles challenges the constitutionality of robbery-murder special circumstance (§ 190.2, subd. (a)(17)).  He argues that after the Legislature passed Senate Bill No. 1437, the felony murder rule has now eliminated any distinction between the robbery-murder special circumstance and the felony murder offense for nonkillers.  Thus, he argues that the robbery-murder special circumstance no longer sufficiently narrows the class of murderers that are eligible for the death penalty or life without parole as required under the Eighth Amendment.  He also argues that the robbery-murder special circumstance is unconstitutionally vague in violation of due process.

a.  **Background**

Before the enactment of Senate Bill No. 1437, section 189 defined felony murder as "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate" certain offenses including robbery.  (Stats. 2010, ch. 178, § 51.)  Under former section 189, nonkillers could be liable for felony murder if they "knowingly and purposefully participate[d] in the underlying felony even if they [took] no part in the actual killing." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1159.)

"Senate Bill [No.] 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  Substantively, Senate Bill [No.] 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability.  Senate Bill [No.] 1437 also adds . . . section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences

43

theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1170.95, subd. (a).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

Following the passage of Senate Bill No. 1437, subdivision (e)(2) was added to section 189, and now limits liability for felony murder to actual killers, nonkillers who, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree"; and subdivision (e)(3) nonkillers who were "major participant[s] in the underlying felon[ies] and acted with reckless indifference to human life . . . ."

b. **Lack of Standing**

Preliminarily, we observe that Quiles lacks standing to challenge the robbery-murder special circumstance under the Eighth Amendment with respect to nonkillers who were sentenced to death and life without parole. The People did not seek the death penalty in this case, and Quiles was not sentenced to death. (*Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907.) Moreover, as we have determined, the jury's verdict reflects that it found that Quiles *was* the actual killer.

c. **Waiver of Argument**

Second, Quiles does not adequately develop his claim that the robbery-murder special circumstance in non-death penalty cases is unconstitutionally vague in violation of due process. Quiles merely cites to the Fifth and Fourteenth Amendments and argues that failure to satisfy the constitutional narrowing requirement "constitutes a void-for-vagueness violation." He does not provide further legal analysis of the issue; thus, we may deem this argument waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[e]very brief should contain a legal argument with citation of authorities on the points made' "].)

44

d. **Duplicative Elements Do Not Render the Special Circumstance Unconstitutional**

Even if we were to consider the merits of Quiles's constitutional claims, we would reject them. First, a special circumstance that has overlapping elements or duplicates elements of the conviction offense does not violate the Eighth Amendment. (*Lowenfield v. Phelps* (1988) 484 U.S. 231 [single aggravating circumstance that duplicated an element of the underlying crime of first degree murder was constitutional despite duplication]; see *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164 ["that section 190.2[, subdivision] (a)(21) contains a constitutional infirmity simply because it duplicates the elements which defined defendant's murder as . . . first degree murder . . . has already been decided to have no merit"].) Thus, even assuming that section 190.2, subdivision (a)(17) duplicates the elements of felony murder for nonkillers, it is not unconstitutional under the Eighth Amendment.

Second, Quiles's claim that the robbery-murder special circumstance is unconstitutionally vague because it has the same elements as felony murder for nonkillers has no merit. Generally, statutes must be precise enough "to provide standards for its application and adjudication to avoid arbitrary and discriminatory enforcement." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 79-80.) However, the fact that the theory of felony murder and the robbery-murder special circumstance have duplicative elements does not render the statutes vague. (See *id*. at p. 80 [rejecting vagueness claim as applied to robbery-murder special circumstance for an actual killer].)

Under section 189, a defendant is guilty of first degree murder if he or she kills during the commission of a robbery. Section 190 provides that first degree murder shall be punishable by death, imprisonment for life without the possibility of parole, or imprisonment for 25 years to life. Section 190.2, subdivision (a) provides that if the robbery-murder special circumstance is found true, a defendant is punishable by death or imprisonment for life without the possibility of parole.

45

As written, the statutes provided Quiles with notice that he would be subject to a sentence of 25 years to life without the possibility of parole, life without parole, or death, if he either committed a statutorily-specified felony and killed someone during the felony or was a nonkiller who satisfied the elements as described under the relevant statutes. "The mere fact that the prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute." (*People v. Andreasen*, *supra*, 214 Cal.App.4th at p. 80.)

For these reasons, Quiles's claim that the robbery-murder special circumstance is unconstitutional under the Eighth and the Fourteenth Amendments must be rejected.

## DISPOSITION

The judgment is affirmed.

46

 

 

 

_____

Premo, Acting P.J.

 

 

WE CONCUR:

 

 

_____

Elia, J.

 

 

_____

Bamattre-Manoukian, J.

 

 

People v. Quiles
H045800